

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MARTIN LUTHER KING JR. FEDERAL BLDG. & U.S. COURTHOUSE
50 WALNUT STREET, P.O. BOX 419
NEWARK, NJ 07101-0419
(973) 645-6340

**WILLIAM J. MARTINI**
    **JUDGE**

## LETTER OPINION

November 14, 2008

Lori Michelle Gaines
Staci J. Greenwald
Sussan & Greenwald
1249 South River Rd.
Suite 104
Cranbury, NJ 08512
(*Attorneys for Plaintiffs D.S. and A.S., individually and as guardians* ad litem of D.S.)

James L. Plosia, Jr.
Apruzzese, Mcdermott, Mastro & Murphy, PC
25 Independence Boulevard
P.O. Box 112
Liberty Corner, NJ 07938
(*Attorney for Defendant Bayonne Board of Education*)

    Re:    **D.S. et al. v. Bayonne Board of Education**
            **Civil Action No. 2:08-CV-01726 (WJM) (MF)**

Dear Counsel:

    This matter comes before the Court on Defendant Bayonne Board of Education's motion for judgment on the administrative record. Defendant seeks a reversal of the decision of an administrative law judge ("ALJ") in a special education matter, under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, which ordered the out-of-district placement of Plaintiffs' disabled son, D.S., at the school district's expense. Plaintiffs also move for reasonable attorneys' fees, costs, and interest thereof, pursuant to 20 U.S.C. § 1415(i)(3)(B), for expenses stemming from the

administrative matter. For the reasons stated below, the decision of the ALJ is **REVERSED** and Plaintiffs' request for attorneys' fee, costs, and interest is **DENIED**.

## BACKGROUND

A.   **Statutory Framework**

IDEA establishes minimum requirements for the education of children with disabilities. The statute requires states to provide such children with a "free and appropriate public education" ("FAPE") that is based on the unique needs of each individual student. 20 U.S.C. § 1412.

Pursuant to the IDEA, each local educational agency must craft, at the beginning of each school year, a detailed instructional plan, known as an IEP, for every disabled child. 20 U.S.C. § 1414(d)(2)(A). An IEP is specially designed for each child, consisting of "a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services." *Holmes v. Millcreek Twp. Sch. Dist.*, 205 F.3d 583, 589-90 (3d Cir. 2000). The child's parents, at least one of the child's special education teachers, a curriculum specialist, and, if requested, a person with special knowledge or expertise related to the child's education develop the IEP. 20 U.S.C. § 1414(d)(1)(B). This team meets no less than annually to determine whether the goals set for the child are being achieved. *Id.* § 1415(b)(6). Parents may reject an IEP if they feel that it failed to provide their child with a FAPE, *id.* § 1415(b)(6) (2008), and then request a due process hearing or a mediation conference to address the IEP, *id.* §§ 1415(e),(f).

In defining the contours of a FAPE, the Supreme Court explained that an appropriate IEP does not need to provide the best possible education, but instead must be "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 207, 102 S. Ct. 3034, 3051 (1982). This requires more than just a *de minimis* educational benefit and mandates the undertaking of a student-by-student analysis that carefully considers the individual student's abilities. *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 248 (3d Cir. 1999); *M.C. v. Central Reg'l Sch. Dist.*, 81 F.3d 389, 393 (3d Cir. 1996). The proffered IEP must allow the child to receive "significant learning and meaningful benefit." *Ridgewood*, 172 F.3d at 247.

Whether an IEP is appropriate "can only be determined as of the time it is offered to the student, and not at some later date." *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993). Evidence acquired after the creation of the IEP should

only be used to evaluate the reasonableness of a school district's decisions at the time they were made. *Susan N. v. Wilson Sch. Dist.*, 993 F.3d 751, 762 (3d Cir. 1995). "Neither the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement." *Fuhrmann*, 993 F.2d at 1040.

**B.     Factual Background**

Plaintiffs, D.S. and A.S., are the parents of D.S., a seventeen year old boy classified under the IDEA as eligible for special education and related services. During the 2008-2009 school year, D.S. will be an eleventh grade student. (R. 24.) Prior to the administrative action, he had attended Bayonne public school since the second grade. (R. Pet'r Ex. 14.)

As a young boy, D.S. suffered from epileptic seizures caused by brain tumors known as Hypothalamic Hamartoma. (R. 3.) Damage resulting from these brain tumors, in addition to large quantities of anti-epileptic medication, negatively impacted his cognitive abilities. Due to these limitations, D.S. yielded a full scale IQ of 74 in the mentally retarded range. (*Id.* at 24.) D.S. repeated the second grade from 1999-2000 and was thereafter classified for special education as "other health impaired" during third grade in 2000-2001. (*Id.* at 3.)

Doctors advised Plaintiffs that removing D.S.'s brain tumors could eliminate the seizures and therefore the need for the dampening anti-epileptic medication. D.S. underwent two brain surgeries in 2001 and 2003 to remove these tumors. The 2001 surgery removed 60-70% of the tumors, decreasing the number of seizures and improving D.S.'s behavior. (*Id.* at 25.) Doctors removed the remaining tumors in 2003, and he has not had another seizure since. (*Id.* at 28.)

Following the surgeries, Plaintiffs engaged several private evaluators to assess whether D.S.'s cognitive abilities improved, including: neuropsychologist Dr. Maria DiDonato; speech pathologist Irma Levine; audiologist Dr. Lorraine Sglarlato-Inducci; and neuropsychologist Jill Brooks  (*Id.* at 28-30, 32, 33.)

In April and May 2006, Dr. DiDonato administered a series of achievement tests while D.S. was in eighth grade. She administered an IQ test that showed D.S.'s IQ did indeed increase after the surgeries. The test revealed that D.S. had a full score IQ of 81, in the low average range. (R. Pet'r Ex. 21.) In addition, Dr. DiDonato administered the Wechsler Individual Achievement Test II ("WIAT"), which evidenced that D.S.'s achievement fell below his grade level. D.S. received the following scores: basic reading skills, assessed at a 6.6 grade level; reading comprehension, assessed at a 4.2 grade level;

3

math numerical operation skills, assessed at a 7.2 grade level, math reasoning skills, assessed at a 5.4 grade level; spelling skills assessed at a 5.5 grade level; written expression, assessed at a 6.2 grade level.  (R. 31.)

      Dr. DiDonato also measured D.S.'s reading levels using the Standard Reading Inventory-Second Edition test, concluding that D.S. had third-grader's reading comprehension and a fourth grade frustration level.  (*Id.*)  Using the questionnaire from the Behavioral Assessment Survey for Children, Dr. DiDonato determined that D.S. had weakness in verbal comprehension and reasoning, written and verbal language fluency, and below average reading comprehension.  (*Id.* at 31-32.)

      Armed with these evaluations, Dr. DiDonato made a series of recommendations to improve D.S.'s education.  The recommendations included: moving D.S. away from distracting stimuli during instruction; providing written instruction verbally as well as on the blackboard; using repetition and overlearning of novel information, rephrasing or re-presenting information in different words when there is evidence that D.S. may not understand what is being asked or presented; using multi-sensory instruction whenever possible; breaking assignments into shorter tasks; teaching encoding strategies such as mnemonics and chunking; allowing extra time for tests; and, when possible, giving test orally.  (R. Pet'r Ex. 22.)

      In July 2006, D.S. underwent a speech language evaluation and central auditory processing assessment at the Robert Wood Johnson University Hospital.  Irma Levin conducted the speech language evaluation by administering two tests, the Detroit Test of Learning Aptitude and the Clinical Evaluation of Language Fundamentals.  (*Id.* at 32.)  D.S. performed poorly on both, scoring below age expectations.  (*Id.*)  In light of these low scores, Levine made several recommendations to improve D.S.'s achievement, specifically participation in pull-out speech therapy three time per week, memory and word finding, and speech therapy sessions in small groups.  (*Id.*)

      In addition to the speech language evaluation, Dr. Lorraine Sgarlato-Inducci conducted a central auditory processing assessment.  She diagnosed D.S. with Impaired Auditory Discrimination, which equates to a severe deficit in central auditory processing skills.  (*Id.* at 33.)  To improve D.S.'s auditory processing skills, Dr. Sgarlato-Inducci recommended intensive speech-language therapy, small group language-based classroom instruction, and further remediation instruction for reading, writing, comprehension, and spelling.  She suggested the use of a research-driven, multi-sensory reading program–such as the Lindamood-Bell, Wilson, or the Orton Gillingham programs–and also advocated, amongst other things, for intensive auditory therapy regimens, visual aids, and FM desktop amplifications systems.  (*Id.* at 33-34.)

Plaintiffs forwarded copies of these evaluations to D.S.'s Child Study Team and requested a meeting to update D.S.'s ninth grade individualized education program ("IEP"), as required under the IDEA. (*Id.*) On November 13, 2006, the Child Study Team met. D.S.'s teachers, Bayonne Case Manager Susan Peraino, Plaintiffs, and Dr. DiDonato attended the meeting. (R. Pet'r Ex. 29.) During this meeting, D.S.'s teachers stressed to Plaintiffs the following: that they were taking a multi-sensory approach; that D.S. was involved in a specialized reading program that addressed spelling, phonics, and reading comprehension; that information was rephrased and restated when necessary; and that material was generally written on both the blackboard and on dittos. (*Id.*) They also acknowledged D.S.'s struggles with reading, grammar, sentence, structure and speech, as well as his shy demeanor. (R. 34.)

The Child Study Team summarized the outside evaluations in an updated IEP issued on November 29, 2006. (R. Pet'r Ex. 29.) Plaintiffs refused to sign the IEP because they believed D.S.'s educational needs had not been addressed, but offered no further suggestions to modify the IEP. (R. 34.)

Following the issuance of the ninth grade IEP, Plaintiffs continued to employ outside evaluators. In January 2007, Dr. DiDonato visited the school, with Bayonne's permission, to observe D.S. for the purpose of assessing his educational program. (*Id.* at 35.) Dr. DiDonato issued a supplemental report based on this four hour snapshot. In the report, she noted D.S.'s inability to keep up with the fast-pace of his classes, need to be tested in a quiet environment as directed by his IEP, lack of physical education program, and need for a structured social environment during lunch. (R. Pet'r Ex 31.) The report remarks that "[t]he goals and objectives in the IEP and the current instructional program being implemented do not adequately address the needs that have been identified." (*Id*.) To remedy these deficiencies, Dr. DiDonato re-articulated recommendations that would allow D.S. "to more fully develop his processing skills and reach his potential that will lead to his future success." (*Id.*) She also concluded that "[a]ny proposed IEP, short of the specific recommendations herein, will be inadequate and inappropriate in meeting her[sic] specific learning needs." (*Id.*)

Plaintiffs also employed Dr. Brooks to conduct an ability-achievement discrepancy analysis to determine whether D.S.'s learning disabilities still existed after the second surgery. Analyzing D.S.'s updated IQ score along with the various standardized test scores, Dr. Brooks concluded that his achievement scores for World Reading, Math Reasoning, and the Math Composite Score were "statistically significantly lower than would be predicted based upon his ability." (R. Pet'r Ex. 32.) Brooks chastised Bayonne for the "minimal services offered to this child throughout his academic career" and for the

lack of intensive learning strategies employed by Bayonne during D.S.'s seizure free period.  (*Id.*)

Dissatisfied with D.S.'s education, Plaintiffs filed a Due Process Petition, on March 19, 2007, against Bayonne Board of Education.  Plaintiffs sought a judicial determination that the IEP for the 2006-2007 school year did not provide D.S. with a free, appropriate public education and also requested an out-of-district placement for D.S. at the Banyan School, in Little Falls, New Jersey at the school district's expense.  (R. 2.)  On April 19, 2007, the New Jersey Department of Education, Office of Special Educations Programs, transmitted the matter to the Office of Administrative Law for a Due Process Hearing.  (*Id.*)  The case was assigned to the Honorable Sandra Ann Robinson.  (*Id.*)

During the pendency of the administrative action, Bayonne reevaluated D.S to ascertain his then-current cognitive level.  In May 2007, D.S. underwent an educational evaluation performed by learning consultant Lucy Hackler and a psychological evaluation by school psychologist Mary Beth Wilkinson.  Hackler administered the Woodcock Johnson III Test of Achievement ("WJ-III"), approximately one year after Dr. DiDonato administered the WIAT test.  (*Id.* at 23.)  D.S. received the following scores on the WJ-III: reading comprehension, assessed at a 3.8 grade level; numerical operations, assessed at a 6.8 grade level; math reasoning, assessed at a 5.3 grade level; and written language assessed at a 5.8 grade level.  (R. Resp't Ex. 14.)  In terms of grade-level equivalence, for these subject areas, D.S. scored lower on the WJ-III than on the WIAT.

As for the psychological evaluation, it consisted of an IQ test and a Multidimensional Self Concept Scale exam, which assessed social-emotional adjustment.  Similar to Dr. DiDonato's evaluation in May 2006, D.S. was evaluated to have a full-scale IQ of 78 in the borderline range of intellectual functioning.  (R. Resp't Ex. 16).  On the Multidimensional Self Concept Scale exam, D.S. received a total scale of 70, in the very negative classification range.  (*Id.*)

Beyond the two evaluations, D.S. received high final grades for the 2006-2007 school year.  His cumulative final GPA for major subjects was a 92.  (R. Resp't Ex. 23.)  He received a 95 in General Science, a 95 in English, a 93 in Language Arts, an 87 in Math, and a 90 in World History.  (*Id.*)  In addition, D.S.'s cumulative GPA for major subjects in the ninth grade surpassed his cumulative GPA for major subjects in previous years.  His cumulative final major subject average for 2005-2006 and 2004-2005 was an 86, down from an 87 in 2003-2004 and an 88 in 2002-2003.  (R. Resp't Ex. 18-21.)

Based on the above, following an extensive hearing that ended on September 21, 2007, Judge Robinson issued an administrative decision dated March 6, 2008.  In this

decision, she determined that Bayonne failed to provide D.S. with a FAPE for the 2006-2007 school year and ordered out-of-district placement of D.S. at the Banyan School. D.S. transferred to the Banyan School on April 2, 2008.

Plaintiffs subsequently filed a complaint in this Court, on April 8, 2008, requesting reimbursements from Bayonne Board of Education for its legal fees, costs, and interest thereof in the administrative action. Two days later, on April 10, 2008, Bayonne filed a separate complaint, requesting that ALJ's decision be reversed. On June 4, 2008, this Court issued an order consolidating the two cases.

## JURISDICTION

The Court exercises jurisdiction under 20 U.S.C. § 1415(i)(2). Any party aggrieved by a decision made under the IDEA by a state educational agency has a right to bring a civil action in state or federal court. *See* 20 U.S.C. § 1415(i)(2)(A). This Court has jurisdiction over these actions "without regard to the amount in controversy." 20 U.S.C. § 1415(i)(3)(A). The IDEA provides that when a federal district court reviews an administrative adjudication:

> [T]he court (i) shall receive records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2). As was the case here, the action must be initiated within 90 days from the date of the hearing officer's decision. § 1415(i)(2)(B).

## STANDARD OF REVIEW

Bayonne submits a motion for judgement on the administrative record. In general, when there is no new evidence presented to the district court, as in this case, "'the motion for summary judgment is . . . the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.'" *D.L. ex rel. J.L. v. Springfield Bd. of Educ.*, 536 F. Supp. 2d 534, 535 n.1 (D.N.J. 2008) (quoting *Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997)). Even though Bayonne has not submitted a motion for summary judgment, this has no practical effect. The parties have not requested that the Court hear additional information and the issues have been fully briefed. The Court has more than an adequate basis to reach its decision.

In reviewing an administrative determination under the IDEA, "the District Court applies a modified version of *de novo* review." *S.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 269-70 (3d Cir. 2003). While "the District Court must make its own findings by a preponderance of the evidence," the court "must also afford 'due weight' to the ALJ's determination." *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir.2004). Thus, "[f]actual findings from the administrative proceedings are to be considered prima facie correct," and where the ALJ has heard live testimony and made determinations of credibility, "that determination is due special weight." *Id.* at 199. Furthermore, "[i]f a reviewing court fails to adhere to [the ALJ's findings], it is obliged to explain why." *Id.*

## DISCUSSION

Under the IDEA standard discussed above, the Court must make a twofold inquiry: (1) whether the state has complied with the procedures set forth under the Act; and (2) whether the IEP developed pursuant to these procedures is reasonably calculated to enable the child to receive meaningful educational benefit. *Rowley*, 458 U.S. at 206-07.

**A.    Meaningful Educational Benefit**

The ALJ concluded that Bayonne did not provide D.S. with a FAPE, because D.S. did not receive a meaningful educational benefit.[1] The ALJ premised this conclusion on the lower test scores D.S. received on the WJ III examination administered in May 2007, as compared to the higher test scores D.S. achieved one year earlier on the WIAT in May 2006. (R. 42.) D.S. received lower test scores in reading comprehension, numerical operations, math reasoning, and written language on the WJ III than on the WIAT as measured by grade level equivalency. However, in reaching this conclusion the ALJ failed to consider an important factor, the grades D.S. received during the 2006-2007 school year.

When determining whether a disabled child received a meaningful educational benefit, courts look to regular examinations, grades, and advancing from grade to grade as important factors in measuring the educational benefit received by the disabled student. *See Rowley*, 485 U.S. at 201; *P.D. v. Franklin Twp. Bd. of Educ.*, No. Civ. 05-2363, 2006

---

[1] In the administrative decision, the ALJ stated that: "Respondent did not provide petitioners with a FAPE that conferred a meaningful education benefit in the least restrictive environment when D.S.'s educational needs were ignored after numerous evaluations and testing was completed, which first established that he could achieve, and then established what remediation was required for him to achieve." (R. 41.)

WL 753152, at *6-7 (D.N.J. Mar. 23, 2006). Courts have also considered standardized test scores, in conjunction with the disabled child's grades, when making such a determination. *See Falzett v. Pocono Mountain Sch. Dist.*, 152 Fed. Appx. 117, 120 (3d Cir. 2005) (stating that "grades and test scores, while not the only relevant factors, indicate that [the disabled student] maintained his high academic abilities."); *G.N. & S.N. v. Bd. of Educ. of Twp. of Livingston*, Civ. No. 05-3325, 2007 WL 2265035, at *12-13 (D.N.J. Aug. 6, 2007) (holding that a child received a "meaningful educational benefit . . . [s]he has advanced from grade to grade, maintaining similarly sufficient grades while advancing . . . [her] progression is also evidenced by her standardized test scores . . . .)

Based on the above standard, when considering D.S.'s grades and standardized test scores together, the preponderance of the evidence indicates the ALJ erred when concluding that D.S. did not receive meaningful educational benefits.

A FAPE must "meet the standards of the State educational agency." 20 U.S.C. § 1401(9). In Bayonne, state core curriculum standards underlie the core curriculum content for all of its students, including special education students. (Def. Br. 21.) A student advances from grade to grade by demonstrating mastery of benchmarks established by the core curriculum standards. (*Id.*) Teachers assess those benchmarks through observation of the student, daily interaction with the student, class work, homework, and grades. (*Id.*)

Bayonne's teachers determined that D.S. achieved those benchmarks for the ninth grade, the 2006-2007 school year. He completed hundreds of assignments for each of his classes, consistently attended class, and received high marks for his school work. (R. 13-16, 18-19.) D.S.'s cumulative grade point average for major subjects was a 92. (R. Resp't Ex. 23.) The lowest grade he received was an 87 in Math, on an exam his teacher characterized as "very difficult." (R. Res't Ex. 23; R. Def. Br. 16.) D.S.'s remaining final grades were in the 90s, including a 95 in General Science and English. (R. Resp't Ex. 23.) In addition, D.S.'s grade point average exceeded his final grades for the proceeding academic years. His cumulative final major subject average for 2005-2006 and 2004-2005 was an 86, down from an 87 in 2003-2004 and an 88 in 2002-2003. (R. Resp't Ex. 18-21.)

Beyond failing to consider D.S.'s grades, the ALJ over-relied on D.S.'s standardized test scores when reaching her decision. The test scores come from two separate tests–the WIAT and the WJ III. Just because the "achievement scores were based on the testing of the same areas of skill development," as concluded by the ALJ, does not necessarily mean that the two test scores can be compared. (R. 8.) Plaintiffs failed to meet their evidentiary burden by not providing evidence that an apt comparison

9

can be made between these two tests. *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 391 (3d Cir. 2006) (stating that the "burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief.") (citing *Schaffer ex. rel. Schaffer v. Weast*, 546 U.S. 49, 58, 126 S. Ct. 528, 535 (2005)).

Additionally, the Court places more weight on D.S.'s academic performance over the course of an entire year, as adjudged by multiple teachers, than on his standardized test scores, especially scores from two distinct exams. While standardized test scores have the benefit of a degree of objectivity, they only provide a three or four hour snapshot of D.S.'s academic achievement and thus are subject to a higher degree of variance. Plaintiffs own expert Dr. Brooks acknowledged that "[t]here are students who do not test well on standardized tests, and for them standardized test results are not a true measurement of their academic ability." (R. 10.) In comparison, final grades represent the aggregate of a whole year worth of academic achievement based on multiple exams, daily interaction, and comparison to peers. Even though D.S. received lower test scores, when these test scores are balanced with D.S.'s grades, the record overwhelmingly indicates that D.S.'s teachers thought that he made meaningful educational progress during the ninth grade. Therefore, D.S. received a FAPE under the IDEA.

### B.   Procedural Problems

The ALJ also concluded that Bayonne denied D.S. a FAPE by violating the IDEA's procedural requirements. In specific, the ALJ concluded that the IEP failed to incorporate the recommendations of D.S.'s outside evaluators, failed to incorporate sufficient support services, and failed to articulate an appropriate reading goal for the 2006-2007 year.[2]  (R. 41-42.) The ALJ further concluded that the "ninth grade IEP failed

---

[2]  The ALJ stated in full:

[R]espondent did not provide D.S. with reading programs and individual intensive studies which according to evaluations and testing results would have advanced his learning ability after surgery. . . .

\*\*\*

Respondent's program and placement for D.S. during the 2006/2007 school year was not appropriate based on the scoring results from evaluations and assessments and the weight of testimony from teachers and medical experts who said D.S.'s needs included: reading goals, individualized basic phonetics training, placement in a multi-sensory reading program that addresses reading comprehension skills (Lindamood-Bell, Wilson, or the Orton Gillingham), intensive speech/language therapy, intensive auditory therapy regimens, an academic environment for small group language-based classroom instruction, remediation instruction for reading, writing comprehension and spelling, usage of visual aids, FM desk-top amplification system and other educational supports.

to incorporate *any* of the recommendations and failed to provide alternatives which could be reasonably calculated to confer an educational benefit for D.S." (R. 42.) (emphasis added)

IDEA requires school districts to develop an IEP for each child with a disability, *see* 20 U.S.C. §§ 1412(a)(4), 1414(d), with parents playing "a significant role" in this process, *Schaffer*, 546 U.S. at 53. Federal regulatory guidelines require that an IEP team consider the strengths of the child, the parent's concern, the results of initial or recent evaluations, and the developmental needs of the child. 34 C.F.R. § 300.324. After considering this information, the IEP team has discretion to decide whether or not to include these recommendations from the parents or outside evaluators in the IEP. *See Lachman v. Illinois State Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir.1988) (finding that educators "have the power to provide handicapped children with an education they consider more appropriate than that proposed by the parents."); *Greenwood v. Wissahickon Sch. Dist.*, 571 F. Supp. 2d 654, 663 (E.D. Pa. 2008) (stating that "[p]arents do not have a right to compel a school district to provide a specific program or employ a specific methodology in educating a student.")

The IDEA does not require a school district to "maximize" a child's education. *See Rowley*, 458 U.S. at 199 (finding that a free, appropriate public education does not require "the furnishing of every special service necessary to maximize each handicapped child's potential.") Even if a school district fails to adhere to an IDEA procedural requirement, errors in and of themselves do not automatically constitute a denial of a FAPE. Only those procedural violations of the IDEA which result in loss of educational opportunity or seriously deprive parents of their participation rights are actionable." *C.M. v. Bd. of Ed.*, 128 Fed. Appx. 876, 881 (3d Cir. 2005).

The preponderance of the evidence suggests that Bayonne fulfilled its procedural obligations under the IDEA. D.S.'s parents played a "significant role" in crafting the 2006-2007 IEP. Plaintiffs and Dr. DiDonato attended the November 13, 2006, IEP meeting, as well as Bayonne Case Manager Sharon Peraino and D.S.'s teachers. (R. Pet'r Ex. 29.) During this meeting, the parties discussed D.S.'s difficulties in certain areas,

---

*\*\*\**
Respondent did not provide D.S. with a personalized educational program and sufficient support services which conferred some educational benefit. Respondent declined to include programs in the current IEP which address the learning deficits identified in the neuropsychological tests, speech-language evaluations, central auditory processing assessments and the classroom observations reports, which would have created a meaningful educational benefit.
(R. 41-42.)

11

especially reading, grammar, sentence-structure, and speech.  (R. 34.)  The teachers also assured Plaintiffs that they were taking steps to address D.S.'s needs, such as a multi-sensory learning approach, and rephrasing and restating when necessary.  (R. Pet'r Ex. 29.)  Moreover, contrary to the ALJ's conclusion, the record indicates that the IEP incorporated recommendations of outside evaluators, such as "chunking" of material, using repetition and overlearning to reinforce novel information, giving tests orally, breaking assignments into shorter tasks, and extending time for testing.  (R. 13-16, 18-19.)

The ALJ was correct that the IEP failed to contain reading goals and did not include all of the recommendations of the educational consultants.  However, as discussed above even without these goals, D.S. received meaningful educational benefit during the 2006-2007 school year, as evidenced by the high marks D.S. earned.[3]

The Court does not deny that an IEP incorporating all of the outside evaluators recommendation would have probably provided D.S. with a better education. The IDEA, however, does not require public schools to "maximize" a child's education.  *Rowley*, 258 U.S. at 199.  The IDEA merely requires that the IEP be reasonably calculated to provide meaningful educational benefits.  *Id.* at 207.

Bayonne has met this mandated threshold.  The preponderance of the evidence does not support the ALJ's conclusion that Bayonne failed to provide D.S. with a FAPE on procedural grounds or because he did not receive meaningful educational benefit.

## CONCLUSION

For the above stated reasons, the ALJ's decision should be **REVERSED** and Plaintiff's motion for attorneys' fees, costs, and interest thereof should be **DENIED**.  An appropriate Order accompanies this decision.

s/William J. Martini  
**William J. Martini, U.S.D.J.**

---

[3] With regards to D.S. receiving a meaningful education benefit in reading during the 2006-2007 school year, Paul Oshust, D.S.'s language arts teacher, awarded D.S. a final grade of 93, based on evaluations of his class work, homework, test results, and a final exam.  D.S. received a 90 or above for all four marking periods.  (R. Resp't Ex. 22-23.)  Oshurt also testified that D.S. made improvements as measured by a pre and post reading test administered by Oshurst.  (Def. Br. 18.)